GENERAL ELECTRIC CO. v. SUNDH ELECTRIC CO. (two cases).

(Circuit Court of Appeals, Second Circuit.  February 15, 1916.)

Nos. 173, 174.

PATENTS ⊂⇒328—VALIDITY AND INFRINGEMENT—SYSTEM OF TRAIN CONTROL.
    The Case patents, No. 736,816, claims 37 and 38, and No. 716,189, claims 12, 13, and 17, both patents being for a system of train control, *held* void for lack of novelty and invention, the combinations claimed being old; also *held* not infringed, if valid.

Appeals from the District Court of the United States for the Southern District of New York.

Suits in equity by the General Electric Company against the Sundh Electric Company. Decrees for defendant, and complainant appeals. Affirmed.

On appeal from final decrees dismissing the bills in two actions based upon two patents granted to Frank E. Case for a system of train control. No. 736,816, known in this litigation as the "First Case Patent," is dated August 18, 1903. This patent contains 62 claims, but only two, 37 and 38, are in issue. No. 716,189, known as the "Second Case Patent," is dated December 16, 1902. This patent contains 17 claims, but only 12, 13 and 17 are in controversy. Although No. 716,189 was issued December 16, 1902, eight months prior to No. 736,816, the latter was applied for February 28, 1898, three years prior to the former and has therefore been referred to as the "First Case Patent."

The alleged infringing apparatus is the same in each suit. Judge Hough held, as to the second Case patent, that the claims in issue covered only "a mechanical readjustment of the combination elements shown by the first Case

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

patent." He found as to the first Case patent that the complainant is limited to a switch actuated by a single current which the defendant does not use; also that the claims in issue, 37 and 38, are invalid for lack of novelty and invention, the combination claimed being old, and that these claims were not infringed.

W. K. Richardson and A. D. Salinger, both of New York City, for appellant.

William B. Whitney, of New York City, for appellee.

Before COXE, WARD, and ROGERS, Circuit Judges.

COXE, Circuit Judge. The first Case patent states that in order to operate a train having a plurality of motor cars successfully, it is necessary that the control be had from a single point on the train, otherwise the amount of work will be unevenly distributed among the motors. To reduce complications to the minimum it is desirable that each car should be a complete unit in itself, provided with a contact device, motor or motors and a suitable controlling mechanism arranged to co-operate with other controlling devices on the train. It is, says the patentee, highly desirable that the contact devices of each car shall take sufficient current for the needs of that particular car and that the heavy currents which actuate the motors should not pass from car to car. The principal object of Case was to provide a system of train control, so that from any point on the train all of the machines may be made to act simultaneously and equally to accelerate the train, maintain it in motion in either direction or retard it evenly and strongly—all of these actions being under the control of a single motorman. The patentee says that he prefers to divide the motors of the train into sets and govern each set of motors by a separate set of controllers. He also provides at a number of selected points on the train master-controllers so arranged that each desired master-controller will actuate all of these controllers. The learned counsel for the appellant says that the switch which is the subject-matter of the first Case patent "is well shown in Figs. 4, 5a and 5b of the patent." This statement is undoubtedly true so far as skilled electricians are concerned but to those who have little expert knowledge on the subject the drawings as shown in Figs. 5a and 5b are inadequate and confusing. The description covering the combinations in controversy is as follows:

"The motor-controller $O$ comprises a plurality of separate electromagnetically-actuated contacts or switches of the form shown in Figs. 3, 4 and 5. Each contact is provided with a cup-shaped casting or supporting-frame $A$, arranged to form a part of the magnetic circuit, and within said casting is mounted an energizing-coil or solenoid-winding $A^1$. Secured to the top of casting $A$ is a cover $A^2$, provided with a downwardly-extending core $A^3$, slightly hollowed out at its lower end to receive the upper end of core $A^4$. On the side of casting $A$ are lugs $A^5$, by means of which the contacts or the switches as a whole are secured to a suitable support. Extending downwardly from the casting are lugs $A^6$, which support pivots $B^2$ of the switch-blade $B$, at the same time forming a part of the magnetic circuit of the blow-out. Connecting the lower ends of the lugs $A^6$ is a piece of wood or other insulating material $A^7$, forming a support for the stationary contact $B^1$. The core $A^4$ is pivotally secured at its lower end to switch-arm $B$ and under normal conditions—that is, when no current is flowing in coil $A^1$—is held in the position shown by a compression-spring $B^3$, and by the weighted arm $B^4$. The spring $B^3$ surrounds a

pivoted pin $B^5$, which acts as a guide for the switch-arm, and at the same time retains the spring in place. The movable core $A^4$ is surrounded by a non-magnetic bushing $A^8$ and surmounted by a sheet-metal cap $A^9$ to prevent it from sticking to the casting and stationary core $A^3$. The outer and inner ends of the switch-blade are insulated from each other, as indicated in the drawings, and connection is established between the outer end of the switch-blade and the motor-circuit by a flexible cable $B^6$, which is wrapped around the pin $B^2$ to further increase the flexibility of the connection. The stationary terminal $B^1$ consists of a spring-supported piece of metal provided at its outer end with a rounded portion $B^7$ with which the switch-blade makes contact. The switch-blade and fixed brush are provided with arcing points or projections $B^8$, as shown in Figs. 3 and 5. The arrangement of the terminal mounted on the switch-blade and the terminal constituting the fixed brush is a particularly desirable one, for it permits a wiping connection between the parts as they are moved to the position shown by the dotted lines, Fig. 4, yet when the parts are free to return to their normal position there is no friction between them tending to retain them in the closed position. On the contrary, there is a decided effort exerted by the brush, tending to force the switch-blade back to its full-line position. The direction of the wiping movement is transverse to the movement of approach of the switch terminals or contacts. When the circuit is first closed between the switch-arm $B$ and brush $B^1$, the projections $B^8$ are in contact: but as the switch-blade moves to its final closed position, as shown in dotted lines, Fig. 4, the projections $B^8$ move away from each other. This particular feature is more fully represented in Figs. 5a and 5b. In the first figure switch-blade $B$ is just making contact with the fixed brush $B^1$ and the projections $B^8$ are in contact. These projections being the first to close the circuit are the last to break it. Consequently all of the arcing takes place at this point, and the remainder of the parts are left bright and clean. Fig. 5b represents the final closed position of the switch-blade, the projections $B^8$ being separated by a definite space. No matter how much arcing takes place at the projections $B^8$ the contact between the parts will always be good, for it is made at some distance from the point at which the arc forms."

The claims are as follows:

"37. In an electromagnetically-actuated switch, the combination of fixed and moving contacts, an actuating-coil for said moving contact located in a control-circuit independent of the circuit controlled by said contacts, and a resilient mounting for one of said contacts so arranged that the said contacts will make a wiping or sliding connection with one another and will tend to be forced apart when the moving contact is released.

"38. In an electromagnetically-actuated switch, the combination of a fixed terminal, a moving terminal, and a resilient connection between one of said terminals, and the support on which it is mounted, an actuating-solenoid for the support on which said moving terminal is mounted, said solenoid being located in a circuit independent of the circuit in which said terminals are located, the two terminals being so constructed and arranged that as the support carrying the moving terminal is moved to cause said terminals to engage, the resiliently-mounted terminal will be displaced in such a manner as to make a sliding or wiping contact with the other terminal."

The elements of the combination of claim 37 are in an electromagnetically-actuated switch:

First: Fixed and moving contacts.

Second: An actuating-coil for said moving contact located in a control-circuit independent of the circuit controlled by said contacts.

Third: A resilient mounting for one of said contacts so arranged that the said contacts will make a wiping or sliding connection with one another and will tend to be forced apart when the moving contact is released.

The claims are substantially alike. In claim 38 the limitation regarding the spring mounting tending to force the switch open when the moving contact is released is omitted.

The prior art abounds in switches with one or both contacts resilient which make a wiping or sliding engagement. This is shown in the Du Shane patent, 312,985. Other prior switches show the feature of Case's patent of utilizing one part of a contact for arching and interrupting the current and the other for carrying on the work current continuously in the fully closed position of the switch. This is shown in Sibley's patent, No. 552,553, and in other patents. Still other prior patents show switches having an actuating coil or solenoid, as Whightman No. 345,561. This appears from the testimony of Mr. Thomas at page 297 of the first record.

If we were dealing with an ordinary machine where the parts and the motive power are plainly seen and understood, the task of the court would be simple enough. But we are dealing here with an esoteric imponderable force which is unseen and about which comparatively little is known. Confining the claims in controversy to the exact thing shown and the result attained, we are unable to discover any patentable advance over the prior art. The patent must be construed in the light of the language actually employed. We are not concerned with what the patentee might have said or should have said but what he actually did say. If the claims 37 and 38 are given a construction broad enough to include the defendant's switches the complainant will encounter the danger of having his claims held invalid by reason of the Sprague switches and several others of the prior art. If such a construction is given the claims of the Case patents, it will be difficult to sustain them in view of the Sibley, Whightman, Sprague and Du Shane switches. It is said that the Case switch is a "contractor." While many of the defendant's references show switches where small currents are employed, the difficulty with this contention is that there is nothing in either claim involved limiting it to a contractor or any other size of switch. We agree with the conclusion of the District Judge and deem it unnecessary to add further to his opinion.

The decrees are affirmed.